IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 11-02783-TUC-CKJ (GEE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| ELMER MARTIN CRUZ-GRIJALVA, | |
| Defendant. | |

The District Court referred this case to the magistrate-judge for hearing on pretrial motions in this case. Hearing on the defendant's motions was held on May 14th and 17th, as well as on June 21st. After reviewing the evidence, the testimony of witnesses, and the arguments of counsel, the magistrate recommends that the District Court, after its de novo review, deny the motions filed by the defendant.

**CHARGE:**

The defendant and two others were charged with conspiring to and transporting undocumented individuals for profit.

**MOTIONS RE: GOVERNMENT'S EXPERT WITNESS:**

It should be noted that the two other co-defendants had already pled guilty prior to May

1  14th when hearing was held on Cruz-Grijalva's pretrial motions. At the hearing counsel for
2  Cruz-Grijalva advised that his previously filed Motion to Sever was moot, and this court
3  dismissed that motion.
4        Defendant also filed a Motion to Compel Disclosure of Expert Witness Information
5  Required by Rule 16 as well as a Motion to Exclude The Testimony of the Government's
6  Alien Smuggling Expert At Trial. The government had disclosed it may call Richard Hill,
7  a special agent with U.S. Customs and Border Protection (CBP) to testify at trial as an alien
8  smuggling expert regarding the structure of alien smuggling organizations, the roles of
9  persons in such organizations, and how money is distributed in the organizations. Defense
10  counsel argues the government's description of the testimony is overly broad and fails to
11  sufficiently satisfy the requirements of Rule 16 "to provide the [expert's] actual opinions, the
12  reasons or bases for the opinions, and the witness's qualification." Attached to its response
13  to the defendant's motions the government attached a copy of Hill's resume which includes
14  a list of his training and experience as an INS, ICE and CBP agent. The government argues
15  Hill's testimony is admissible under Rule 702, Federal Rules of Evidence, which specifically
16  deals with testimony by expert witnesses, and the government cites to *United States v. Mejia-*
17  *Luna,* 562 F.3d 1215, 1219 (9th. Cir. 2009), wherein the Court upheld the expert testimony
18  of agent Hill regarding "...how alien smuggling operations typically operate, the division of
19  responsibility among numerous actors, the methods used, and the manner and method of
20  payment."
21        During the hearing defense counsel admitted that although he was aware agent Hill
22  has testified as an expert alien smuggling witness in previous cases in this court and had, in
23  fact, testified in a case in which defense counsel was involved, he (defense counsel) believes
24  he is entitled to more specific contents of Hill's anticipated testimony because each case is
25  "fact specific". Government counsel argued Hill will be used as a "'blind witness' and will
26  not be provided any case specific information" before testifying in the present case; therefore
27  Hill's testimony in each case is largely the same and is "fact neutral."
28

**MOTIONS TO SUPPRESS EVIDENCE/STATEMENTS:**

The defendant asks the court to suppress: (1) all evidence and statements obtained as the result of an unlawful stop, search, and seizure in violation of the Fourth Amendment, and (2) a statement obtained in violation of *Miranda* and the due process requirement of voluntariness.

**EVIDENCE:**

*Oscar Miramontes*

Miramontes has been a Border Patrol Agent in the Tucson Sector since January, 2005. He is a canine handler and on July 12, 2011, he was training with his dog near Madera Canyon on Whitehouse Canyon Road east of I-19. Agents Tena and Nutwell were with him. Miramontes has regularly worked patrol duty in that area, and has encountered narcotics and alien smuggling in that area. The area is not heavily populated, and is mostly used for hiking, camping, picnicking and other outdoor recreational activities.

At about 1 p.m. on July 12, 2011, Miramontes and Tena were standing along the south side of the road and saw two vehicles traveling eastbound. The vehicles, a red sedan with some paint discoloration on the passenger side and a temporary registration tag and a Suburban, were traveling in tandem. There was a single male in the Suburban which was behind the sedan with two male occupants. As the vehicles traveled east he and Tena commented on what they had seen; Miramontes stated that in his experience two vehicles traveling in tandem in this area are often involved in smuggling narcotics or aliens. About 10-15 minutes later, the same two vehicles passed his location going westbound. Miramontes stated it was unusual for him to see the same two vehicles traveling in tandem between Whitehouse Canyon and Madera Canyon in such a short time. As soon as the vehicles passed the second time and after some discussion with agent Tena, Miramontes ran to his vehicle and began to follow them. He also got on his radio and advised of his location, what he had just observed, that he was in pursuit, and asked if there were other agents in the area who might assist. When he caught up to the Suburban, he no longer had visual contact with the

1   red sedan. He put out a BOLA ("be on the lookout alert") for the red sedan which he believed
2   was acting as a scout vehicle for the Suburban.

3       Miramontes testified that on both occasions when the two suspect vehicles passed his
4   location he noticed that the driver of the Surburban sat very "stiff and rigid" and did not make
5   eye contact with the agents as they stood alongside the road. The agents were in uniform and
6   Miramontes stated it is customary for a passing driver to somehow acknowledge the presence
7   of agents. When Miramontes caught up with the Suburban he noticed the driver maintained
8   the same stiff posture; the driver side front window was down and Miramontes testified the
9   driver kept looking at his rear-view mirror, "just constantly making eye contact with me."
10  At some point they came to a four way stop intersection and Miramontes was directly behind
11  the Suburban; the driver of the Suburban made a "rolling stop" through the stop sign.
12  Miramontes stated he felt this was dangerous because there were other vehicles in that area;
13  therefore Miramontes initiated his emergency equipment. The Suburban's driver made some
14  gestures with his left hand, and then pulled over to the side of the road after the agent hit his
15  horn a couple of times. After approaching the Suburban Miramontes saw a person sitting in
16  the front seat, another sitting on the floor board in the front, and a lot of others in back lying
17  on top of each other. Miramontes believed he had apprehended a load of illegal aliens.
18  Miramontes opened the driver's door and told the driver he was under arrest. Miramontes
19  then noticed that other agents were arriving at the scene behind him.

20      Miramontes testified that about 15 minutes or more had lapsed between the time he had
21  lost visual contact with the red sedan and the arrival of the other agents at the scene. Because
22  there were so many suspects (a total of nine aliens plus the driver) all the agents at the scene
23  were involved in securing the aliens. Upon questioning by Miramontes, the driver, identified
24  as Ronald Wickware, advised there was a gun in the Suburban. Wickware also asked
25  Miramontes if they had caught the other vehicle. Wickware stated the driver of the red sedan
26  was a tenant of his and had offered to pay him for transporting the aliens. Wickware allowed
27  Miramontes to examine his phone and stated that someone in the red sedan had been in
28  contact with him via a cell phone.

1   Miramontes then received a call from an agent who had apparently pulled over the red
2   sedan in response to Miramontes' BOLA. Miramontes advised the agent that the driver of the
3   Suburban had identified the driver of the red sedan as the person who had recruited him into
4   this smuggling venture and was supposed to lead him (Wickware) to the location to unload
5   the aliens.
6   Miramontes stated he saw the occupants of the sedan when he got back to the Border
7   Patrol station but had no other contact with them.
8   On cross-examination Miramontes testified he never saw anyone on the phone in the
9   red sedan.
10
11  ***Richard Tena***
12   Tena has been a Border Patrol agent for 11 years, is familiar with the Green Valley
13  area including Whitehouse and Madera Canyons, and has encountered many narcotics and
14  alien smuggling incidents in that area. On July 12, 2011, around 1 p.m., he and agent
15  Miramontes were standing along the road between Whitehouse and Madera Canyons when
16  Tena saw a red sedan followed by a beige Suburban drive eastbound pass them. His interest
17  was "peaked" when he noticed there were two males in the sedan followed closely by the
18  larger Suburban with only one male occupant. He thought it was "odd" when 10-15 minutes
19  later he saw the two vehicles pass going west; from Tena's location it was a half hour drive
20  to reach Madera Canyon; therefore he believed the vehicles had not gone as far as Madera
21  Canyon. From his experience he knew there was no other sights or legitimate places of
22  interest before reaching Madera Canyon. However, he testified, there is a curve in the road
23  that is popular for loading up narcotics and aliens. Tena noticed this time the passenger in the
24  lead vehicle–the red sedan–was on the phone. The Suburban was again following the red
25  sedan closely and there was "mound of blue" in the rear of the Suburban which had not been
26  there previously. From his previous experience Tena believed it was a blue blanket being
27  used to "obscure" someone lying in the back. Tena stated that he mentioned to Miramontes
28  that the "blue mound" had not been in the Suburban when it first passed their location

1 eastbound. Miramontes was closest to his vehicle and so Miramontes began to follow the
2 vehicles while Tena got into his vehicle. By the time Tena caught up Miramontes had already
3 pulled over the Suburban.
4      On cross-examination, Tena stated that each time the suspect vehicles passed his
5 location, they were about a car length apart.

### *Marcos Soto*

8      Soto has been a Border Patrol agent for ten years. On July 12, 2011, he was assigned
9 to the Green Valley area. He was driving south on Old Nogales Highway to Green Valley
10 when he heard a BOLA which advised agents to be on the lookout for a maroon sedan with
11 a temporary license plate and some discoloration on the front of the vehicle. There was also
12 information the sedan was somehow involved with a load of illegal aliens that another agent
13 had stopped. After receiving this information he saw what he believed to be the subject of the
14 BOLA. Soto was then traveling south on Nogales Highway just north of Pima Mine Road
15 which he estimated was about 10-15 miles from where he understood the load of aliens had
16 been stopped. Soto testified he turned his vehicle around in order to get behind the suspect
17 vehicle, did a check of the temporary tag and initiated a stop of the vehicle. Soto then
18 received information that a gun had been found in the alien load vehicle, and so, for officer
19 safety, he asked the two occupants of the suspect vehicle to exit the car. Soto testified that
20 Cruz-Grijalva was not the driver of the suspect vehicle. Soto then received a call from
21 Miramontes who stated that the driver of the Suburban had stated the occupants of the red
22 sedan were involved in his alien smuggling activities; Miramontes also advised that the name
23 of one of the occupants of the sedan was "Elmer" (which the defendant's first name). Soto
24 then placed both individuals under arrest and had them transported to the Tucson Border
25 Patrol Station for processing.
26      Soto testified that at the station he read both suspects their *Miranda* rights using the
27 Border Patrol form I-214. Soto, who described himself as a "native Spanish speaker", stated
28 he read the rights to defendant Cruz-Grijalva in Spanish and also showed the printed form to

him. The defendant signed the form acknowledging that the rights had been read to him, and Soto and another agent also signed. *See* Exhibit 2 attached hereto. Soto stated other agents then came and interviewed the defendant, and that ended his involvement in the case.

On cross-examination Soto testified that he heard Miramontes's BOLA at about 1:30 and about 10 minutes later he spotted the red sedan. He initiated the stop and then broadcast that information; after receiving additional information from Miramontes, he arrested the two suspects at about 2 p.m. Soto stated that neither of the occupants appeared nervous and both were cooperative. Miramontes had advised Soto that on the basis of information he had received from the driver of the Suburban he (Miramontes) believed there was probable cause to arrest the occupants of the red sedan for their involvement in alien smuggling. Soto stated he relied on this information in deciding to arrest the two suspects. Soto admitted that at no time did he observe the red sedan speeding, and he never observed any suspicious behavior on Cruz-Grijalva's part. Soto also stated that at no time in his presence did Cruz-Grijalva sign the line on the I-214 to waive his rights.

### *Juaquin Alvarez*

Alvarez is a native Spanish speaker and has been a Border Patrol agent for over 12 years. On July 12, 2011, he interviewed the defendant. Alvarez identified Exhibit 3 (attached hereto) as the Form I-214 he used to advise the defendant of his *Miranda* rights on that date. Alvarez testified the defendant signed to acknowledge that he both understood his rights and was willing to answer questions without an attorney present. Alvarez stated he was aware that earlier that day another agent had advised the defendant of his rights. During the interview with Alvarez the defendant denied any involvement with alien smuggling on that day. Both occupants of the red sedan were later released, uncharged.

During the processing of the red sedan occupied by the defendant on July 12, 2011 a cell phone was discovered and seized. A search warrant for the phone was obtained and it was discovered "the phone was communicating with Ronald Wickware" (the driver of the Suburban in which the aliens were found). An arrest warrant was obtained for the defendant

- 7 -

1 and he was arrested on August 2, 2011. At the Border Patrol Station on August 2nd Alvarez
2 again interviewed the defendant after the defendant signed the Form I-214 acknowledging and
3 waiving his *Miranda* rights. *See* Exhibit 4, attached hereto.

4 The interview with the defendant on August 2nd was videotaped and recorded. Alvarez
5 testified that at no time did the defendant ask to terminate the interview, nor did he indicate
6 he could not understand the agent  During that interview the defendant admitted his
7 involvement in the alien smuggling activities of July 12th.

8 During cross-examination, Alvarez stated he  considered his questioning of the
9 defendant on July 12, 2011, and August 2, 2011, "interviews", not "interrogations". In his
10 opinion interrogations  are "more aggressive" that interviews. He denied having received
11 "any training in terms of using techniques to try to break down a witness and get them to
12 confess."

13 At some point during the interview on August 2nd the defendant asked Alvarez why he
14 had been arrested again and Alvarez advised they now had new evidence they had gotten from
15 a cell phone found in the red sedan which indicated someone in the sedan had been
16 communicating with the driver of the Suburban on July 12th. Alvarez denied discussing the
17 defendant's immigration status or his green card on the August 2nd.

18

19 **DISCUSSION:**
20 **Motions to Compel Disclosure of Expert Witness Information and to Exclude Testimony**
21 These motions should be denied. The Ninth Circuit has already held admissible the
22 expert testimony of agent Hill regarding "how alien smuggling operations typically operate,
23 the division of responsibility among numerous actors, the methods used, and the manner and
24 method of payment." *United States v. Mejia-Luna,* 562 F.3d 1215, 1229 (9th Cir.2009). Hill
25 is the same witness proposed by the government in the present alien smuggling case.

26 The government has stated it will use Hill as a "blind witness", i.e., he will not be
27 provided any case specific information regarding this case; and has provided the defense with
28 a copy of Hill's resume, including a list of his training and experience as an INS, ICE and CBP

1  agent. This information, along with defense counsel's admitted experience with agent Hill in
2  a previous alien smuggling trial is sufficient to demonstrate that the defense will have adequate
3  notice of Hill's expert testimony.

**Motion to Suppress Evidence**

The defendant argues: (1) the stop of the red car in which he was a passenger on July 12, 2011, lacked reasonable suspicion; (2) his arrest on that day was without probable cause; and (3) the search of the phone found in the red car was done without probable cause and without a valid warrant.

The initial stop of the red sedan on July 12th resulted from the BOLA issued by agent Miramontes. Both agents Miramontes and Tena testified they had seen the red sedan and the Suburban pass them driving eastbound in tandem toward Madera Canyon and saw the vehicles driving again in tandem from the Madera Canyon area about 10-15 minutes later. The amount of time lapsed led them to conclude the vehicles had not traveled as far as the canyon which is known to be an outdoor recreational area. The agents knew of no other points of interest between their location and the canyon. However, from past experience both knew the area was used for drug and alien smuggling activity; in fact, just east of the location where they first saw the two vehicles was an area known for loading narcotics and aliens, Furthermore, both agents noticed a blue covered "mound" in the back of the Suburban which had not been present when the vehicles first passed the agents traveling eastbound. They believed the blue material was being used to cover someone in the rear of the Suburban. Miramontes immediately got into his vehicle and followed the Suburban. When Miramontes caught up to the Suburban he no longer had visual contact with the red sedan and so issued a BOLA on the red sedan as he believed both vehicles were involved in alien smuggling–with the red sedan serving as a scout vehicle. Based on the totality of the circumstances this court concludes there was reasonable suspicion for agent Miramontes to issue the BOLA on the red sedan in order to investigate its possible involvement in alien smuggling. Furthermore, based upon the description of the red sedan (the discoloration on the passenger's side, two occupants, the temporary license tag) and

the time and its location when agent Soto saw it and initiated a stop, the court concludes agent Soto reasonably believed it was the subject vehicle in the BOLA.

Regarding the arrest of the defendant on July 12th, agent Soto testified that after stopping the red sedan he received a call from agent Miramontes who advised that the driver of the Suburban had stated the occupants of the red sedan were involved with him in smuggling the aliens found in the Suburban and that one the sedan's occupants was named "Elmer." Miramontes advised Soto that he (Miramontes) believed he had sufficient evidence to arrest the occupants of the sedan; Soto then placed the sedan's occupants under arrest and they were transported to the Border Patrol station. Defense counsel argues that arrest was not supported by probable cause.

The Ninth Circuit has applied the collective knowledge doctrine in a case very similar to the present one and held: "Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment." *United States v. Ramirez,* 473 F.3d 1026, 1037 (9th Cir. 2007). This court concludes that agent Miramontes, given his personal observations and statements he received from the driver of the Suburban, had both reasonable suspicion to stop the red sedan and probable cause to arrest the occupants.

Regarding the legality of the seizure of the phone found in the red sedan and the subsequent search of that phone, defense counsel initially argued the search lacked probable cause. Subsequently, it was disclosed the phone was searched pursuant to a search warrant. After having been provided a copy of the search warrant and supporting affidavit defense counsel filed a Motion to Suppress pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978), arguing the affidavit contained false statements or omissions which rendered the search warrant invalid. This court granted the motion and on July 21, 2012, hearing was held.

***Franks* Issue**

On July 14, 2011, while processing the red sedan referred to above, agents discovered

- 10 -

1  a cell phone between the front passenger seat and the center console.  On July 19th Border
2  Parol agent Muncaster applied for and was granted a warrant to search that phone for telephone
3  numbers, call logs, stored numbers, and electronically stored voice and text messages.
4  Apparently, the Border Patrol was seeking to establish some contact between the driver of the
5  Suburban and the occupants of the red sedan.  As a result of the search of the phone an arrest
6  warrant was issued for the defendant; he was arrested on August 2nd and interviewed.  During
7  that interview the defendant admitted his involvement in the alien smuggling activities on July
8  12th.

9  Defense counsel argues that in a handwritten paragraph of the search warrant affidavit
10  agent Muncaster falsely stated  "Agent Miramontes observed the driver of the [red sedan] on
11  a cell phone as the vehicle drove by westbound."  Counsel noted that in his testimony in an
12  earlier hearing in this case, Miramontes had specifically stated he had not seen anyone in the
13  red sedan using a phone.  Muncaster was the only witness called at the *Franks* hearing on July
14  21st and he testified as follows: He has been employed as a Border Patrol agent for the past six
15  years, and the Application and Affidavit at issue in this case was the first of his career.  In
16  preparing the document he reviewed the written narratives prepared by the agents and spoke
17  with agent Miramontes and other agents.   He presented the Application and Affidavit to the
18  magistrate and after she read it she advised him an amendment or addendum was necessary.
19  When he asked her if he needed to return to the station and rewrite it, she said no.  According
20  to Muncaster the magistrate then "had me handwrite the addendum at the bottom portion."
21  Muncaster testified he had no reports with him at that time and wrote the paragraph from
22  memory.

23  On cross-examination Muncaster stated his supervisor Juaquin Alvarez asked him to
24  prepare the affidavit for the search warrant; Muncaster also admitted the purpose of the search
25  warrant was "to establish a connection between Mr. Wickware [driver of the Suburban] and
26  the phone that was in the vehicle driven by Mr. Robles [the third co-defendant in this case].
27  Muncaster testified that he was aware two of the persons initially arrested in this case had been
28  released but he did not know whether they had been actually presented for prosecution.  His

1 supervisor instructed him to write "basically a synopsis of the encounter" and provided a
2 sample of an affidavit he (the supervisor) had written in the past. Although Muncaster had
3 testified on direct that he had spoken to agents involved in the incident before writing his
4 affidavit, on cross-examination he stated it was possible he did not speak to any of the agents
5 after receiving the assignment to write the affidavit. Muncaster also testified that after
6 reviewing the affidavit, the magistrate told him the affidavit needed more and told him what
7 the deficiencies were. Muncaster could not recall if Miramontes had ever really told him that
8 he saw the driver of the red sedan using a cell phone. Muncaster admitted that some of
9 information in the affidavit may not have come from his discussing the events with the agents,
10 but could have come from his reading their written reports. He admitted he did not attempt to
11 contact any of the agents involved or his supervisor before adding the handwritten paragraph
12 to the affidavit.

13       This court does not believe that the fact Muncaster falsely wrote that Miramontes had
14 seen the driver of the red sedan using a cell phone on July 12th should end the inquiry in the
15 present case. Based upon the testimony of Muncaster and the contents of the affidavit as it was
16 initially presented to the magistrate it is clear the magistrate was concerned whether, aside
17 from the statement of the defendant Wickware, some reliable witness had actually seen an
18 occupant of the red sedan using a phone. Clearly, an agent who was a percipient witness to
19 the events of July 12th would have been such a reliable witness. Agent Tena testified he had
20 seen the passenger using a cell phone as the red sedan passed his location on July 12th. Agents
21 Tena and Miramontes had written a report regarding the events of July 12th. Muncaster
22 testified he read agents' reports before preparing his affidavit and it is reasonable to assume
23 that he merely mistakenly remembered that Miramontes, not Tena, had seen an occupant using
24 a phone, and furthermore, that he had mistakenly recalled that it was the driver, not the
25 passenger, who using the phone. Given the fact that the issue apparently of concern to the
26 magistrate was establishing that a reliable witness had seen someone in the red sedan using a
27 phone during the time period in question, the resolution does not depend on the name of the
28 agent-witness, nor even upon whether it was the driver or the passenger seen using the phone.

1    In view of the foregoing, this court concludes that the misinformation contained in the
2 handwritten statement which agent Muncaster added to the affidavit was not a deliberate
3 falsehood, does not demonstrates a reckless disregard for the truth, and was not intended to
4 mislead the magistrate as to facts material to her determination of whether or not a search
5 warrant should issue.  Therefore, the search warrant was valid.

6

7 **Motion to Suppress Statements**

8    Defense counsel argues the statement made by the defendant on August 2, 2011, should
9 be suppressed because it was "obtained in violation of *Miranda,* and the due process
10 requirement of voluntariness."

11    Exhibit 4 demonstrates that on August 2nd the defendant signed a Form I-214 indicating
12 he understood his *Miranda* rights and was willing to waive those rights and speak with the
13 agents.  There was no evidence presented to suggest the defendant had not himself signed the
14 I-214,  that he had not understood what he was signing,  that he had been compelled to sign the
15 form against his will, or that he had invoked his right to counsel at any time during the
16 interview.

17    The recorded interview was conducted in Spanish, and the government introduced a
18 CD (*see* Exhibit 5 attached hereto) of the interview, and also provided the court with a written
19 English transcription of the interview.  Defense counsel did not object.  This court reviewed
20 the English transcription.  Although defense counsel suggests  the defendant's will was
21 overborne because the agents threatened he would lose his green card if he failed to cooperate
22 this court found no evidence to support that argument. There was, however, one instance when
23 an agent advised the defendant he could "help himself" by being cooperative and providing
24 truthful information.  Neither the length of that exchange, nor the words used or the
25 defendant's response suggests a specific threat intended to overbear the defendant's will.

26

27 **RECOMMENDATION:**

28    In view of the foregoing it is recommended that, after its independent review of the

1 record, the District Court: (1) **DENY** the motions relating to the testimony of the proposed
2 expert witness, agent Hill; and (2) **DENY** the motions to suppress evidence and statements.
3 This Report and Recommendation is being faxed to all counsel on this date. Counsel must file
4 all objections within 14 days of today's date. Failure to file objections may constitute a
5 waiver. **FURTHERMORE, the District Court has ordered that hearing on any motions**
6 **in limine as well as any objections to this Report and Recommendations shall be heard**
7 **on July 30, 2012, at 10:45 a.m.**

8       The Clerk of the Court is directed to send a copy of this Report and Recommendation
9 to all parties.

10       DATED this 13th day of July, 2012.

_____
Glenda E. Edmonds
United States Magistrate Judge