**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 11-02783-TUC-JGZ (LAB) |
| Plaintiff, | **ORDER** |
| vs. | |
| 2) Elmer Martin Cruz-Grijalva, | |
| Defendant. | |

Pending before the Court is Defendant's Motion for a New Trial (Doc. 200), the Government's response (Doc. 204), and Defendant's reply. (Doc. 207.) For the following reasons, Defendant's motion is denied.

**FACTUAL BACKGROUND**

On August 10, 2011, Defendant was charged by Indictment with one count of Conspiracy to Transport Illegal Aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii), and 1324(a)(1)(B)(i), and two counts of Transportation of an Alien in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(i). (Doc. 23.) The case was tried to a jury on August 7 and 8, 2012. On August 8, the jury returned verdicts of guilty on all counts. (Docs. 190, 191, 192.)

At trial, the government presented the testimony of United States Border Patrol Agents Oscar Miramontes, Marcos Soto, Wilfredo Diaz, and Joaquin Alvarez, and the transcripts of interviews of the Defendant, and material witnesses Aron Vasquez-Mazon and

1   Fidel Acosta-Yanez.  Agent Miramontes testified that mid-day on July 12, 2011, he and
2   Agent Richard Tena were conducting canine training in the desert along White House
3   Canyon Road near mile marker 4, when the agents observed a red sedan with two male
4   occupants driving eastbound in tandem with a tan Suburban, the Suburban following the
5   sedan.   The occupants of the vehicles did not appear to notice the agents on the side of the
6   road.  That particular stretch of White House Canyon Road leads to Madera Canyon and is
7   an area known for drug and alien smuggling.  Businesses along that stretch include a gift
8   shop, lodging, and hiking trails. There are no gas stations.

9          Ten to fifteen minutes later, the agents saw the same two vehicles driving westbound
10  in tandem past the agents.  No other vehicles had passed the agents' location in the interim.
11  This time, as the sedan drove by the agents, both occupants of the sedan saw the agents; they
12  turned their heads and looked right at the agents with eyes wide open as if they were shocked
13  or in disbelief.  When the Suburban drove by, Agent Tena said, "I see a mound in the back.
14  I see a mound." Agent Miramontes ran 20 to 30 yards to where his truck had been parked,
15  put his canine partner in, then got back on White House Canyon Road, driving westbound
16  to try to catch up to the vehicles.  He also requested assistance over the radio.

17         By the time Agent Miramontes caught up to the Suburban, the vehicles were no longer
18  driving together.  Agent Miramontes put out a look out for the sedan.  Agent Miramontes
19  pulled behind the Suburban and noticed that the driver kept looking back in his side view
20  mirror.  The driver appeared nervous, stiff and rigid.  Agent Miramontes continued to follow
21  the Suburban as it rolled through the stop sign at the four-way stop at the intersection of
22  Continental Road and White House Canyon Road, at which point Miramontes activated his
23  lights and sirens.  The driver, co-defendant Ronald Wickware, stuck his left arm out the
24  driver's window and began using his fingers to signal the agent  "five, four, five, four,"
25  before he pulled the vehicle to the shoulder of the road.  When Agent Miramontes
26  approached the Suburban, he observed nine other individuals in the vehicle.  Agent
27  Miramontes attempted to determine the citizenship status of the people inside the Suburban.

28

He noted that one was a U.S. citizen and some were inadmissible aliens. He did not determine the citizenship of two of the individuals.

Agent Soto testified that he heard Agent Miramontes' radio call to be on the lookout for the maroon sedan with gray primer in the front and a temporary license plate. Agent Soto was also aware of Agent Miramontes' discovery of undocumented aliens in the Suburban. Agent Soto was traveling south on Old Nogales Highway when he observed the sedan traveling northbound toward Tucson. He stopped the sedan and arrested the two occupants, Antonio Robles, the driver, and Defendant, the front seat passenger. Robles and the Defendant were transported by other agents to the Border Patrol Station for further processing.

Special Agent Alvarez, Department of Homeland Security, Office of Inspector General,[1] interviewed the Defendant after his arrest on July 12, 2011. Defendant admitted that he had previously been arrested for alien smuggling near Casa Grande, Arizona, but denied involvement with the aliens found in the Suburban and stated he was in the area looking for a residence to do a job and got lost. Defendant was released after the interview.

On July 14, 2011, Border Patrol Agent Diaz, a seized property specialist,[2] conducted an inventory search of the maroon sedan and discovered a cell phone lodged deeply between the front passenger and the driver's seats. Agent Soto retrieved the phone and notified the intel guard unit that he had found a phone in the vehicle.

Agent Alvarez received the notice and obtained a search warrant to search information on the phone. Comparison of the phone information with Wickware's phone showed that the two phones were communicating with each other a day prior to and several hours prior to Wickware's arrest on July 12, 2012, and that calls were made at 9:40, 10:47, 11:20, and

---

[1]Special Agent Diaz was a lead agent with the United States Border Patrol at that time.

[2]A seized property specialist is responsible for documenting property seized by Border Patrol agents in the performance of their duties; when a vehicle is seized, the specialist is responsible for removing all personal property from the vehicle, documenting the property left behind, and securing the property for the individual.

1   12:35, with the longest call occurring around 12:30 p.m. and lasting 52 seconds.  Based on

2   this information, officers obtained an arrest warrant for Defendant and arrested him on

3   August 2, 2011.

4            On that same day, Special Agent Alvarez re-interviewed Defendant.  The interview

5   was recorded and played for the jury.   During the interview, Agent Alvarez told Defendant

6   that agents had found evidence that contradicted his claim that he was in the area to find a

7   job.  Defendant then disclosed that he received a call from a person he knew only as El

8   Guero, who instructed him to go pick up a group of six illegal immigrants.  Defendant

9   needed money and was to be paid "$800 to a $1,000 dollars."  He hired Wickware to pick

10  up the group and directed Wickware to the pick up location.  He told Wickware that some

11  members of the group had papers and some did not.  Defendant admitted that he was in cell

12  phone contact with Wickware and the guide of the group; through these phone calls, he led

13  Wickware to the pickup location; and upon being stopped by Agent Soto, he hid his cell

14  phone in the sedan in the seat.  Defendant stated that he did not know where they were going

15  to take the group; he was to be contacted with directions "once they got to this side."  When

16  asked how many times had done this, Defendant answered, "Sincerely, it's the second time."

17           Material Witness Fidel Acosta-Yanez testified that he is a citizen of Mexico, without

18  documentation to lawfully enter the United States.  He crossed the border into the United

19  States on foot through the mountains near Santa Cruz about five days prior to his arrest.  He

20  was part of a group of nine: seven members of the group carried marijuana, the others carried

21  food.  The group was traveling to Tucson.  A guide led the group to a little road where the

22  marijuana was picked up by a pick up truck the day before Acosta-Yanez's arrest.  The group

23  remained at that location until Wickware arrived and picked them up the following day.

24           Material Witness Aron Vasquez-Mazon testified that he is a citizen of Mexico,

25  without documentation to lawfully enter the United States.  He entered the United States by

26  jumping over a fence near Santa Cruz, Mexico, and was headed to Tucson where,

27  approximately one year ago, he had lived for two to three months.   He testified that he and

28  a few others were  carrying food for the group and other members of the group were carrying

- 4 -

marijuana.  Vazquez-Mazon corroborated that the marijuana and the guide were picked up, and a day later, the rest of the group was picked up by Wickware.  Vasquez-Mazon understood that the marijuana was to go to Tucson and that the group would be picked up and taken as far as Tucson.  Both Acosta-Yanez and Vasquez-Mazon expected to be paid for their role in transporting the marijuana.

## DISCUSSION

Rule 33, Fed. R. Crim. P., provides that the court may grant a new trial if the interest of justice so requires.  "A district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal."  *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992).  The court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and evaluate the credibility of the witnesses in that process.  *Id.*  If the court concludes that the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may grant a new trial.  *Id.*  at 1211-12.

Defendant asserts that he is entitled to a new trial because: (1) the Court failed to give a curative instruction during Defendant's closing  argument; (2)  the Government misstated the elements of transporting an alien in its closing argument; and (3)  the Government committed prosecutorial misconduct.  The Government contends that a new trial is not in the interests of justice.

### A.   Defendant was not entitled to a curative instruction during closing argument.

The focus of defense's closing argument was that the Government failed to prove Defendant intended to provide transportation to help undocumented aliens remain in the United States illegally.  Defendant asserts that the Court erred in not giving a curative instruction in response to the government's objection to one part of his argument.  The Court finds that the government's objection was properly made and no curative instruction was required because defense counsel's statement  was an incorrect statement of the law and

1   Defendant was permitted to present his defense. The relevant portions of Defendant's

2   argument follow:

| | | |
|---|---|---|
| 3 | Defense Counsel: | There's just no evidence in this case that Aron Vasquez-Mazon and Fidel Yanez-Acosta made any arrangements at all to be smuggled, and they weren't going to be smuggled for no reason.   And if the purpose of their movement, the purpose of their transportation was not in order to assist them or help them remain in the United States, unless it's to help them stay in the United States, it's just not a crime. So, for example, if you are driving somebody to Mexico and that person is an illegal alien, that's not a crime. |
| 10 | The Government: | Objection, Your Honor. |
| 11 | Court: | Sustained. |
| 12 | Defense Counsel: | That's not a crime as alleged here under 13 – |
| 13 | The Government: | Objection, Your Honor. |
| 14 | Court: | Sustained. |
| 15 | Defense Counsel: | The issue is whether or not there's an intent to, a purpose of assisting a person to remain in the United States illegally. So, for example, if these people were going to be brought to Tucson just to be paid for this drug crime, that is not done with a purpose of assisting them to remain illegally. That's done with the purpose of getting them to be paid. And most likely these people were going to head back to Mexico after they're paid. |
| 21 | The Government: | Objection, Your Honor. |
| 22 | Court: | You can make your argument in your rebuttal, Mr. DeJoe. |
| 24 | The Government: | Okay. |
| 25 | Defense Counsel: | Reasonable doubt can be based upon common sense.  There's nothing saying that the government can prove their case by common sense. They have to provide it by evidence.  But the instruction tells you that you can – that reasonable doubt can be based upon common sense, and |

common sense tells you these people are here to do a job, to make some money, and the likelihood is that they are going to return to their country. There's no evidence to the contrary. No questions were asked about whether they intended to remain permanently. Those questions just weren't asked of these individuals [the aliens].

And that's what it would take to – if the government wanted to try to meet their burden, they would have to ask those kind of questions. Well, where were you going to go? Were you going to live there? Were you going to stay there. They didn't ask those kind of questions. They didn't ask, well, where were you going to be paid? They didn't ask those questions. The likelihood is that when you look at all the facts here is that this guy Guero or whoever it was was going to pay these people to pick up these people in the desert because it was part of this drug trafficking operation.

Defendant also argued that there was no evidence of any kind of arrangement being made between the two aliens and anyone else for them to be transported illegally, particularly an agreement to help them remain in the United States illegally; that the aliens were helping smuggle a product, they were not the subject of the smuggling; there was no evidence that the Suburban was going to Tucson and Defendant did not know where the vehicle was headed; if the vehicle was headed to Tucson, it could have been just to pay the aliens for their smuggling work; and, although Defendant had admitted to smuggling aliens previously, there was no evidence that on this occasion he intended to assist the aliens in remaining in the United States illegally.

Defense counsel was nearing the end of his closing argument when the fire alarm went off and the courtroom was cleared. Subsequently, the Court met with counsel and allowed them to provide authority and state arguments as to Defendant's contention that driving an illegal alien to Mexico is not a crime. Thereafter the Court affirmed its earlier ruling sustaining the objection, noted that defense counsel may have been cut off by the fire alarm and, when closing argument resumed, permitted defense counsel to make any further

arguments regarding the fourth element and the government's need to prove that element. Defense counsel requested Court give a curative instruction advising the jurors that although the Court sustained an objection as to the statement "it's not a crime to drive aliens to Mexico," the fact that someone was driving a person south towards Mexico is a factor that could be considered in determining whether the transportation was in order to help the alien remain in the United States illegally. The Court declined to give the proposed instruction, but advised counsel he could make that argument to the jury. When closing argument resumed, defense counsel argued that factors for the jury to consider in deciding whether the government proved Defendant's intent to help aliens remain in the United States illegally included whether the Suburban was going north or south, and whether the government even proved exactly where the vehicle was going. Defendant, however, asserts that the Court's sustaining the Government's objection left the jurors with the impression that the argument was not legally valid and impacted Defendant's Constitutional right to present a defense and right to counsel. Defendant asserts that a curative instruction was required.

Defendant cites no authority for the proposition that transporting an illegal alien to or toward Mexico is not a violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Section 1324(a)(1)(A)(ii) makes it unlawful for anyone to knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transport such an alien within the United States by means of transportation, in furtherance of such violation of law. To prove a violation of section 1324, the Government must prove that the defendant *intended* to further the alien's presence in the United States. *United States v. Hernandez-Guardado*, 228 F.3d 1017, 1022 (9th Cir. 2000); *United States v. Gonzalez-Hernandez*, 534 F.2d 1353, 1354 (9th Cir. 1976). Proof of such intent requires a showing of a direct or substantial relationship between the defendant's transportation of the alien and its furtherance of the alien's unlawful presence in the United States. *United States v. Moreno*, 561 F.2d 1321, 1323 (9th Cir. 1977) (the element is not satisfied if the transportation of the alien is "only incidentally connected to" the alien's illegal entry or continued illegal presence).

1  Factors relevant to this determination include time, place, distance and overall impact of the

2  transportation.  *Moreno*, 561 F.2d at 1323.

3         No one fact is necessarily dispositive in the analysis.  *Compare Hernandez-Guardado,*

4  228 F.3d at 1022-24 (finding direct and substantial relationship to the furtherance of aliens'

5  illegal presence in the United States where defendant shuttle drivers, in the course of their

6  employment, transported illegal aliens for one leg of the aliens' migration to locations within

7  the United States) *and Gonzalez-Hernandez*, 534 F.2d 1353, 1354 (9th Cir. 1976) (finding

8  direct and substantial relationship where defendant was paid to transport illegal aliens already

9  illegally within the country from California to Washington so aliens could find employment)

10 *with Moreno*, 561 F.2d at 1323 (finding no direct and substantial relationship to furthering

11 aliens' illegal presence in United States where foreman for reforestation company was

12 required to drive other workers who were undocumented from one job site to another

13 because the transportation was incidental to the defendant's employment).  In fact, the Ninth

14 Circuit in one case expressly declined to adopt a *per se* rule that driving an alien for a

15 particular purpose or to a particular location is sufficient in determination of the intent

16 element of the offense.

17         We do not imply that there is an *ipso facto* exemption for those
           who transport undocumented aliens for employment or as an
18         incident to employment.

19         We merely state that where the transportation of such an alien
           occurs, there must be a direct or substantial relationship between
20         that transportation and its furtherance of the alien's presence in
           the United States.

21

22 *Hernandez-Guardado*, 228 F.3d at 1023.[3]

23         [3]In his argument to the Court, Defendant relied on *United States v. Cuevas-Reyes*, 572 F.3d

24 119 (3rd Cir. 2009).  *Cuevas-Reyes* involved charges of harboring of aliens.  There, defendant was
   on board a private plane with four illegal aliens, who had paid to be transported from the Virgin

25 Islands to the Dominican Republic.  The plane had departed the Virgin Islands but was returned by
   tower control.  In reversing the defendant's conviction, the court concluded no evidence supported

26 the finding that defendant helped the aliens remain in the United States because defendant's actions
   were undertaken for the purpose of removing the women from the country.  In addition to the plane

27 having left the country, the Court noted that the defendant did not transport the aliens to the airport

28 but merely directed them to meet him at the plane.  *Id.* at 120-23.  The facts of *Cuevas-Reyes* are

1      Moreover, although the Court sustained the objection to this one statement of law by

2   defense counsel in his closing, the Court permitted counsel to argue his theory of the case and

3   counsel did so extensively.  Ultimately, Defendant's theory of the case was rejected by the

4   jury, and in reviewing the evidence, the Court concludes that the evidence supported the

5   verdict and there is no indication of a miscarriage of justice.  Defendant conceded that he was

6   hired to transport undocumented aliens (and others) to a location which would be disclosed

7   to him during the course of the transportation. He was paid to do so.  The two material

8   witnesses testified that they were undocumented aliens and that when they were done

9   smuggling marijuana, they expected to go to Tucson.

10      **B.    The Government's rebuttal argument did not misstate the elements of the offense or unfairly prejudice Defendant.**

11

12      The government's closing argument included the following remarks, to which the

13   Defendant objected:

14      This is your job, ladies and gentlemen, is to find whether the government has proven these four elements beyond a reasonable doubt.

15   . . .   And then the fourth [element], the defendant knowingly transported or moved both of those individuals in order to help them

16   remain in the United States illegally.  Well, folks remember Agent Miramontes. [The Defendants] drove by Agent Miramontes with

17   shocked looks on their face. They didn't stop. They didn't tell them, oh, well, Border Patrol is here.  Let's turn these aliens over to them.

18   Let me stop and let them know that there's a group of aliens.  They drove right by two Border Patrol agents.  That's helping them stay in

19   the United States unlawfully.

20      Defendant asserts that government impermissibly misled the jury as to the fourth

21   element of the offense by arguing  the defendants "drove right by two Border Patrol agents."

22    Defendant contends that the government's argument would only be appropriate if Defendant

23   were charged with Harboring Aliens. In support, Defendant points to Ninth Circuit Model

24   _____

25   unique to that case and the court's holding does not lead to the undisputed conclusion that driving an undocumented alien to Mexico is not a crime.  In the present case, unlike *Cuevas-Reyes*, there

26   was no direct evidence  that Defendant intended to help the undocumented aliens in the group leave

27   the United States: the group was picked up at a location a distance from the border, not every member of the group was an undocumented alien,  and Defendant did not know where they were to

28   be driven.

1    Jury Instruction 9.3, which states that to be found guilty of Harboring of Illegal Aliens, the

2    government must prove that the defendant harbored, concealed, or shielded from detection

3    an illegal alien for the purpose of avoiding his detection by immigration authorities.  Viewing

4    the government's argument as a whole, the Court concludes that the government's argument

5    was proper in light of the applicable law.

6           As noted in section A above, to prove the illegal transportation charge, the

7    government was required to prove that the defendant knowingly transported an alien in order

8    to help him remain in the United States illegally.  This determination is fact specific and

9    takes into account time, place, distance and overall impact of the transportation.  *Moreno,*

10   561 F.2d at 1323.  The Defendant's intent in arranging the transportation of the aliens was

11   a question for the jury and the government is not required to prove that intent by direct

12   evidence.  *Hernandez-Guardado*, 228 F.3d at 1023.  The Defendant's response to the

13   presence of Border Patrol agents near the pick-up site and his attempt to distance himself

14   from the Suburban carrying the undocumented aliens constitutes circumstantial evidence that

15   the jury was entitled to consider in determining whether Defendant intended to assist the

16   aliens to remain in the United States illegally.[4]  His concealment of the aliens is evidence that

17   the Defendant knew he was engaged in the unlawful conduct of transporting illegal aliens

18   within the United States.

19          Moreover, Defendant's failure to alert Border Patrol agents as to the presence of

20   illegal aliens in Wickware's vehicle was not the only evidence of Defendant's intent to

21   transport aliens in furtherance of their violation of the law.  Defendant testified that he knew

22   he was picking up illegal aliens; he was to be paid $800-$1000; he was in contact with

23

24   _____

25          [4]Defendant contends that proof that the Government's misstatement prejudiced him is
     evidenced in a juror's post-conviction recitation of the allegedly improper argument as justification
26   for the conviction.  Inquiry into a jury's deliberations to impeach a jury verdict is improper; Rule
     606(b), Fed. R. Evid., prohibits the use of juror testimony to impeach a verdict when the testimony
27   relates to intrinsic matters. *Tanner v. United States,* 483 U.S. 107, 107 S.Ct. 2739 (1987); *United
     States v. Hernandez-Escarsega,*886 F.2d 1560, 1579 (1989).  Here, the challenged statement was
28   intrinsic; it was made in closing argument to the jury.

Wickware; and, after the aliens were loaded, he expected to be contacted and told where to deliver the aliens.  Vasquez-Mazon testified that he was traveling to Tucson.  Acosta-Yanez testified that he believed that the group of nine aliens were carrying marijuana to Tucson. The vehicles separated only after Defendants came upon the Border Patrol agents.  Thus, the Court concludes that there was ample evidence to support the jury's finding that Defendant knowingly aided the transportation of aliens in furtherance of their illegal presence in the United States.

### C.     The Government's actions did not render the trial unfair.

Defendant contends that the prosecutor improperly expressed his personal opinion about the evidence, the prosecutor misstated the evidence, and the prosecutor disparaged defense counsel in his closing argument.

"When prosecutorial misconduct is alleged, 'the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly.'" *United States v. Sullivan*, 522 F.3d 967, 982 (9th Cir. 2008) (quoting *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000)). "Prosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence." *Henderson*, 241 F.3d at 652.  However, a prosecutor's obligation is not simply to obtain a conviction, but to obtain a fair conviction. *Brown v. Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991).  "The trial judge has broad discretion in controlling closing argument, and improprieties in counsel's arguments to the jury do not constitute reversible error unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Navarro*, 608 F.3d 529, 535-36 (9th Cir. 2010) (internal quotations omitted).

Prosecutorial statements to which the defendant objects are reviewed for harmless error, while comments for which no objection is made are reviewed for plain error. *United State v. Brown*, 327 F.3d 867, 871 (9th Cir. 2003).  A review for plain error is limited to error that affects substantial rights. Fed. R. Crim. P. 52(b).  To affect substantial rights, the error must have been prejudicial: "It must have affected the outcome of the district court

proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993).  It is the defendant's burden to establish prejudice under the plain error standard.  *Id*. at 734-35.  The Court concludes that none of the prosecutor's actions entitle Defendant to a new trial.

### 1.  Vouching

Defendant asserts that the prosecutor vouched for the Government's case when he stated, "[s]o again folks they drive right by two Border Patrol agents.  Now if that's not helping someone remain illegally, I don't know what is."  As Defendant did not object to the Government's statement, it is reviewed for plain error.  *See Brown*, 327 F.3d at 871.

"As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in credibility of government witnesses." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993).  However, a prosecutor must have reasonable latitude to fashion closing argument, and thus can argue reasonable inferences based on the evidence.  *Id*.  When considering whether vouching has occurred, the court should consider several factors:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*Id.* at 1278.

The Court concludes that in the context of the entire trial, the prosecutor's statement of his personal opinion as to the strength of the evidence was not so gross as to prejudice Defendant.  He did not comment on a witness's veracity; there was no indication that the prosecutor had extra-record knowledge; the degree of personal opinion was minimal; the jury was twice instructed that arguments made by counsel are not evidence; and the prosecutor's statement was limited to a single instance that rebutted Defendant's assertion in closing argument that the Government had no evidence that Defendant intended to provide transportation to help the aliens remain in the United States illegally.  *See United States v. Young*, 470 U.S. 1, 12-13 (1985) (reversing a conviction is not warranted if a prosecutor's

1  remarks were "invited" and did no more than respond substantially in order to "right the

2  scale.")

3                2.  Incorrect statements of fact

4        As to his second contention, Defendant asserts that in opening statements and closing

5  argument, the Government incorrectly asserted that Defendant stated he intended to transport

6  the aliens "north."  The government did erroneously state in opening and closing argument

7  that the Defendant gave a statement and in his statement said he was asked to pick up aliens

8  and bring them further north.  The Defendant objected only to the prosecutor's misstatement

9  at closing  and that objection was sustained.   In addition, in his own closing, Defendant

10  pointed out to the jurors that the government had misstated that evidence.  After closing

11  argument, the Court instructed the jury that arguments made by the attorneys in closing are

12  not evidence and further instructed the jurors to ignore statements where an objection had

13  been sustained. The jurors were told that if they remembered the facts different from the way

14  the lawyers stated them, the juror's memory controls.  *Id.*   Given defense counsel's

15  arguments refuting the prosecutor's misstatements and the Court's instruction, any prejudice

16  to Defendant was neutralized.  *See Navarro*, 608 F.3d at 535-36.   Moreover, as the

17  government's argument that the aliens were being taken north was supported by other

18  evidence, the misstatement is not so gross as to prejudice Defendant and require a new trial.

19                3.  Disparaging remarks

20        Finally, Defendant contends that the prosecutor made disparaging remarks in his

21  rebuttal, accusing defense counsel of trying to hide the truth.  Before the prosecutor began

22  his rebuttal summation, he requested that defense counsel leave his visual aid standing, which

23  obstructed the jury's view of the Defendant.  The prosecutor then stated:

24                  I don't have to prove why they [the aliens] were here, where
                they were going, what they thought, what they were hoping for,

25                  what they wished would happen.  That's not – I don't have to
                prove that to you, and that's a decision you don't have to make.

26                  A lot of what you heard about drug trafficking going on, it
                doesn't matter. It has no bearing on your decision.  This is done

27                  to try and divert your gaze from the defendant telling you he
                was guilty when you saw him talk, when you saw hi[m] give his

28                  statement. And it's literally trying to do that.  You can't even

> see the defendant because this [the visual aid] is up.  So, again, all we are trying to do on the side of the government is to present the facts to you.
>
> The fact is that those two people are aliens and that the defendant, Elmer Cruz-Grijalva, transported them for money. That's the question you have to ask yourself, not how did Border Patrol handle drug smuggling case, not whether these two paid Ronald Wickware or paid Elmer Cruz-Grijalva. That's not what you are here for.  That's not your job.  Judge Zipps is going to explain to you that that's not your job.

Defendant failed to object to the prosecutor's statements; thus, the Court reviews the statements for plain error.  *See Brown*, 327 F.3d at 871. Viewing the trial evidence as a whole, the prosecutor's statements and conduct were not so gross as to render the jury impartial in its consideration of the evidence.  Accordingly, the Court finds that a new trial is not warranted.

### 4.  Cumulative Error

Defendant contends that the Government's improper comments and misconduct cumulatively prejudiced him.  The Court disagrees.

"In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple error may still prejudice a defendant." *Fredrick*, 78 F.3d at 1381.  Where the government's case is weak, a defendant is more likely to be prejudiced by the cumulative errors.  *Id*.  In this case, Defendant has failed to demonstrate that multiple errors occurred at trial, let alone, multiple errors which in combination prejudiced him.  The evidence, and in particular Defendant's admissions, strongly supported the jury's verdict.

Accordingly, IT IS ORDERED that Defendant's Motion for a New Trial (Doc. 200) is DENIED.

DATED this 1st day of November, 2012.

Jennifer G. Zipps
United States District Judge

- 15 -